**Anibal Garcia ROUSSEAU, Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 70910.**

Court of Criminal Appeals of Texas, En Banc.

Feb. 24, 1993.

Rehearing Denied April 7, 1993.

Brian W. Wice, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and Winston E. Cochran, Jr., Charles Rosenthal and Lorraine Parker, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for State.

## OPINION

MALONEY, Judge.

Appellant, Anibal Garcia Rousseau, was convicted of capital murder. V.T.C.A. Penal Code, § 19.03(a)(2).[1] At the punishment phase of appellant's trial, the jury answered affirmatively the special issues set forth in Article 37.071(b) of the Texas Code of Criminal Procedure. The trial judge then sentenced appellant to death as required by Article 37.071(e). Direct appeal to this Court was then automatic. Article 37.071(h) V.A.C.C.P.. We will affirm the judgment of the trial court.

Appellant raises thirty-one points of error. He does not challenge the sufficiency of the evidence to support the guilty verdict; however, he does challenge the sufficiency of the evidence to support the jury's affirmative answer to each of the three special issues submitted at the punishment phase of trial. *See* Article 37.071(b) V.A.C.C.P..

■ Appellant's first and second points of error complain that the trial court refused appellant's requested instruction on mitigating evidence and overruled his objection to the mitigation instruction that was submitted in the charge, citing *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934,

106 L.Ed.2d 256 (1989). Appellant contends that mitigating evidence presented at trial entitled him to, if not his requested instruction, then one that was different from the one submitted. This evidence included: (1) testimony that appellant surrendered himself to law enforcement authorities without incident, (2) evidence of appellant's good behavior in jail, and (3) evidence of appellant's history of drug abuse.

The fact that appellant turned himself in without incident can be considered in the same light as the evidence of his good behavior in jail pending trial. The United States Supreme Court squarely addressed the issue of good behavior in *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), and held that this type of evidence could be given full effect under the Texas special issues and did not require an additional jury instruction. *Id.; see also Lauti v. State*, 810 S.W.2d 176 (Tex.Cr. App.1989); *Ex parte Jacobs*, 843 S.W.2d 517, 519–20 (Tex.Cr.App.1992) (reh'g denied) (cooperation with police is not type of evidence requiring *Penry* instruction).

■ Evidence of appellant's drug use was elicited through his own testimony at the punishment stage of trial. Beginning in 1969, appellant was arrested and convicted several times for selling heroin. Appellant testified that he did not begin to *use* heroin, however, until 1982[2], at which time appellant was 42 years old.[3] At the time of his arrest in the instant case, appellant appears to have been using heroin frequently as evidenced by a photo taken after appellant's arrest showing scarring on his arms caused by needles. Although the evidence clearly showed that appellant used drugs, we have held that such evidence does not rise to the level of "Penry" evidence requiring an additional instruc-

---

1. The Texas capital sentencing scheme has been amended since appellant's trial in 1989, but these changes do not affect the analysis here. All references in this opinion are to the pertinent statutes in effect at the time appellant's case was tried.

2. At one point, appellant stated that he started using "dope" in 1982. It is unclear from the record whether appellant meant that he began

using strictly heroin at this time or whether he meant other types of drugs. Appellant had previously testified that he occasionally "smoke[d] weed."

3. Appellant testified that after one arrest he lied to Texas Department of Corrections officials by telling them that he had become an addict at age 32, in hopes of receiving a lighter sentence.

tion. *Nobles v. State*, 843 S.W.2d 503, 507 (Tex.Cr.App.1992) (reh'g denied); *Ex parte Ellis*, 810 S.W.2d 208, 212 (Tex.Cr.App. 1991).

Since the mitigating evidence presented by appellant in this case did not require a *Penry* type charge, we will not address whether the form of the additional instruction that was submitted was sufficient. Appellant's first and second points of error are overruled.

In his third point of error, appellant contends that the trial court erred in refusing his requested charge on the lesser included offense of felony murder. Appellant argues that the instant offense was not intentionally committed, as required by the capital murder statute, but instead was committed with only the mens rea to meet the lesser standard of felony murder, i.e. that appellant intended only to rob David Delitta and not to cause his death. Appellant also calls into question the continued vitality of the *"Royster test"* in light of the Fifth Circuit's opinion in *Cordova v. Lynaugh*, 838 F.2d 764, 767 (5th Cir.), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 932 (1988).

■ We have since *Royster v. State*, 622 S.W.2d 442 (Tex.Cr.App.1981), consistently held that a two-prong test is to be met before a jury charge on a lesser included offense must be given: first, the lesser included offense must be included within the proof necessary to establish the offense charged, and, second, some evidence must exist in the record that if the defendant is guilty, he is guilty only of the lesser offense. *Aguilar v. State*, 682 S.W.2d 556, 558 (Tex.Cr.App.1985) (citing *Royster v. State*, 622 S.W.2d 442 (Tex.Cr.App.1981)). In applying the second prong of the *Royster* test, the trial court's determination as to whether there is some evidence that raises an issue of a lesser included offense is distinct from the jury's ultimate determination as to whether the defendant is guilty only of the lesser offense and not of the greater offense. *See Lugo v. State*, 667 S.W.2d 144, 146 (Tex.Cr.App.1984). These separate considerations were delin-

eated in *Bell v. State*, 693 S.W.2d 434, 442 (Tex.Cr.App.1985):

> If evidence from any source raises the issue of a lesser included offense, the charge must be given … 'it is … well recognized that a defendant is entitled to an instruction on every issue raised by the evidence, whether produced by the State or the defendant and whether it be strong, weak, unimpeached, or contradicted.' (Citations omitted.) It is then the jury's duty, under the proper instructions, to determine whether the evidence is credible and supports the lesser included offense. (Citations omitted.).

Although we have long-recognized the importance of distinguishing between the roles of court and jury in the context of lesser included offenses, *Lugo*, 667 S.W.2d at 146 (quoting *Liskosski v. State*, 23 Tex. App. 165, 3 S.W. 696, 698 (Tex.Ct.App. 1887), we have never explained the relationship between those roles and the application of the *Royster* test.

■ A comparison of the federal standard with the *Royster* standard is helpful in understanding the delineation between the roles of court and jury in applying *Royster*. The federal standard set forth in *Cordova* provides that

> a lesser included offense instruction should be given 'if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater.'

*Cordova*, 838 F.2d at 767 (quoting *Hopper v. Evans*, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). Although the Fifth Circuit has noted that the *Royster* test "seems very similar" to the federal standard, *id*. at 767 n. 3, one prominent difference between the two is the reference in the federal standard to the rational findings of a jury. We think that by similarly tieing the "guilty only" language in the *Royster* test to the rational findings of a jury, the roles of court and jury will be better understood in applying *Royster*. It becomes apparent that the appropriate test to be applied in determining whether a defendant is entitled to a charge on a lesser included offense is the following:

first, the lesser included offense must be included within the proof necessary to establish the offense charged, and, second, some evidence must exist in the record *that would permit a jury rationally to find* that if the defendant is guilty, he is guilty only of the lesser offense.

(emphasis on portion added to *Royster* test). In applying the two-prong test [4], the trial court should make a determination as to whether the evidence of the lesser offense would be sufficient for a jury rationally to find that the defendant is guilty only of that offense, and not the greater offense. We will now turn to the facts of the instant case.

■ We have held that felony murder is a lesser included offense of capital murder.[5] *Creel v. State*, 754 S.W.2d 205, 211 (Tex.Cr.App.1988). The only difference between the two offenses is the culpable mental state of the offender. *Id.* Capital murder requires the existence of an "intentional cause of death," *id.*, while in felony murder, "the culpable mental state for the act of murder is supplied by the mental state accompanying the underlying … felony…." *Rodriguez v. State*, 548 S.W.2d 26, 29 (Tex.Cr.App.1977). *See also Santana v. State*, 714 S.W.2d 1, 9 (Tex.Cr.App. 1986) (capital murder prohibits intentional taking of a life, while underlying felony provides mental state in felony murder context). Thus, appellant meets the first prong of the two-part test.

■ Under the second prong of the test, appellant was entitled to a charge on the lesser included offense of felony murder if there was some evidence that would permit a jury rationally to find that appellant had the intent to rob the victim, but not cause his death. In determining whether the trial court erred in failing to give a charge on the lesser included offense, we review all of the evidence presented at trial. *Havard v. State*, 800 S.W.2d 195, 216 (Tex.Cr.App. 1989) (opinion on reh'g); *Lugo*, 667 S.W.2d at 147. A review of the evidence as presented at trial reflects the following: the victim, David Delitta, and his colleague, James Sullivan, both Environmental Protection Agency investigators [6], were making their way to a restaurant for dinner after parking Delitta's car in the lot. On the way to the door, they were accosted by an individual who "popped up" from between some parked cars. Sullivan testified that the man was carrying a cocked short-barrel firearm and had made no apparent attempt to conceal his identity. The gunman had the weapon lowered, but when he ordered the men to move back toward the car and they continued walking forward, he became agitated and pointed his weapon at them. After Sullivan and Delitta complied with the gunman's demands, he again lowered his weapon and then ordered the men to place their valuables on the trunk of the car. After they complied, the gunman motioned for the two men to move several feet away to a neighboring parking lot while he proceeded to recover the valuables that had been placed on the car. Sullivan took this opportunity to try to take cover from the gunman. As Sullivan moved toward a truck parked nearby, the victim, Delitta started reaching for a gun he kept in an ankle holster. Sullivan testified that as Delitta was hopping around on one foot, attempting to retrieve his weapon, the gun-

---

4. We note that we do not intend that our interpretation of the *Royster* test change the substantive test. We seek only to interpret and therefore clarify existing law.

5. Under V.T.C.A. Penal Code, § 19.02(a)(3), the elements of felony murder as they relate to this case are:
 1. a person
 2. commits or attempts to commit a felony (robbery)
 3. and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt

4. the person commits an act clearly dangerous to human life
5. that causes the death of an individual.
Under V.T.C.A. Penal Code, § 19.03(a)(2), the elements of capital murder as they relate to the instant case are:
 1. a person
 2. intentionally commits a murder in the course of committing or attempting to commit a robbery.

6. According to Sullivan's testimony, Delitta was a criminal investigator for the EPA, and Sullivan was a civilian administrative investigator.

man approached Delitta, raised his own weapon and said, "Stop or I will shoot." Delitta continued attempting to free his weapon and move further away from the gunman, but the latter followed him and just about the same time Delitta freed his weapon the gunman fired two shots towards Delitta who fell to the ground yelling that he had been hit. Sullivan recounted at trial that the gunman had tracked Delitta and had taken "very deliberate" aim before firing. However, a passerby witness testified that Delitta took the first shot and the offender was only returning fire.[7] The record indicates that there was some additional exchange of gunfire, but is not entirely clear as to who fired when or how often. The gunman fled after this series of events transpired. The gunman was identified by Sullivan following the offense and also at trial as appellant. However, two witnesses for the defense testified that appellant was not the offender.[8] Testimony elicited from the attending physician at the hospital revealed that the fatal bullet had passed through Delitta's arm and entered his abdomen just below his rib cage.

■ Appellant argues that Sullivan's testimony that the offender was calm and lowered his weapon while Delitta and Sullivan surrendered their valuables, and the testimony that the offender did not discharge his weapon until after Delitta drew his own weapon, was some evidence that the offender intended to rob but not cause the death of Delitta. Appellant further asserts that he was entitled to a charge on the lesser included offense because the offender "gave Delitta ample opportunity for the latter to cooperate before Delitta's drawing and [the] exhibition of his weapon compelled the appellant to fire his [weapon]." Appellant's arguments imply that because his actions were somehow "provoked" by Delitta, appellant did not have the requisite intent to cause his death. However, whether or not appellant's actions were "provoked",[9] is irrelevant to the issue of whether appellant intended to cause Delitta's death. *See Davis v. State*, 597 S.W.2d 358, 360 (Tex.Cr.App.) (in trial for capital murder committed in course of robbery, evidence that appellant claimed he shot victim because the victim "was going to take the gun away from me" is irrelevant to issue of appellant's guilt or innocence for victim's death), *cert. denied*, 449 U.S. 976, 101 S.Ct. 388, 66 L.Ed.2d 238 (1980). We also reject appellant's contention that certain of the offender's actions in allowing the victims to cooperate was evidence that the offender did not have the requisite intent to cause the death of Delitta. The possibility that initially or at some point during the commission of the robbery the offender did not have an intent to cause death does not amount to evidence that the offender did not intend to cause the victim's death when the murder was committed. There is no requirement in the case of capital murder committed in the course of a robbery, that the intent to cause death be premeditated or formulated prior to the commission of the robbery. The offender must only have formulated an intent to cause death when he actually commits the murder. The evidence shows that appellant aimed his gun at the victim, fatally shooting him in a vital area of the body. The testimony that the offender did not

---

**7.** Jerry and Maria Griffin testified that they were driving on the feeder road approaching the restaurant when they heard shots and slowed down. Jerry Griffin's testimony indicated that the gunman was only returning fire:
Q. [Defense counsel] Could you see who—I mean when you heard that first shot, did you see where it was coming from first, or did you get to see that at all, or did you just hear it? A. [Jerry Griffin] I saw it came from the man in the suit [who had been identified previously as Delitta].

**8.** Both Jerry and Maria Griffin testified that they had viewed the perpetrator clearly, in close proximity, and that appellant was not the gunman.

**9.** In point of error twenty-four appellant claims the evidence was insufficient to support the jury's affirmative finding on the third special issue, whether appellant's actions were reasonable in response to provocation by the victim. We concluded that the evidence was sufficient to support the jury's affirmative finding on the third issue, that appellant's actions were not reasonable in response to provocation, if any, of the victim.

fire the first shot does not amount to evidence that the offender had not formulated the intent to cause Delitta's death in returning fire. Neither does the testimony that the offender initially gave the victims the opportunity to cooperate amount to evidence that the offender had not formulated the requisite intent at the time he caused the death of the deceased. We conclude there is no evidence upon which a jury could rationally find that appellant had the intent to rob, but not the intent to cause the death of, the victim, and consequently, appellant was not entitled to a charge on the lesser included offense. Point of error number three is overruled.

■ In his fourth point of error, appellant alleges that the trial court erred in granting the State's motion to quash the jury panel. Over defense counsel's objection, the trial judge dismissed one of twelve groups of ten venirepersons prior to the individual voir dire of that group, based upon the mistaken belief that he had violated the dictates of Article 37.071(g) V.A.C.C.P., during his introductory remarks to that group. Appellant alleges on appeal that this action denied him the opportunity of having two additional black and one additional Hispanic venirepersons sit on his jury.

Twelve groups comprised of an average of ten veniremembers [10] were called separately. Each group was initially addressed by the trial judge, sworn in,[11] addressed further by the trial judge and then each individual in the group, separate and apart from the other members of the group, was subject to voir dire by the parties. The error at issue occurred during the calling of the eighth group.[12] The group was sworn in and the judge proceeded with his general instructions. In the course of discussing the special issues and describing the sentencing scheme of a capital case, the judge informed the eighth group of the effect of answering both (or all three) special issues "yes"[13] and the effect if the jury were to answer even one of the special issues "no":[14]

> THE COURT: Now, then, Issue 1 and 2, as well as Issue 3, if it is submitted to you, if you answer all of those Special Issues yes then the law mandates the Judge to assess the punishment at death for the Defendant. If, however, you answer either one of those questions no, then the law mandates the Judge to assess the Defendant's punishment at life imprisonment. So, that is the way we arrive at the punishment. So, you do not assess it but that's the way it's arrived at. Does everyone understand that?

The venirepersons then responded affirmatively and the court added that, "[t]hese must be unanimous also." The prosecution then asked to approach the bench whereupon there was a conference outside the hearing of the venire after which the judge told the group of venirepersons, "[t]he lawyers are telling me you're not supposed to know. I appreciate that. But, the verdict must be unanimous and they all must be in the affirmative. Does everybody understand that?" And, again, the venirepersons responded in the affirmative.

After the preceding transpired, the judge continued to give the group further instructions. Nothing more was said about the earlier statements until after the judge finished his introductory remarks to the group in question and had excused the

---

10. These groups of venirepersons were referred to by both the trial judge and the parties in their briefs as "panels"; however, we will refer to them as "groups".

11. Although the court reporter did not transcribe the oath given, we assume that the court administered the oath set forth in article 35.02 V.A.C.C.P., under which venirepersons avow to truthfully answer questions propounded relating to their qualifications as jurors.

12. The record reflects that appellant was served with lists of the names of venirepersons summoned for various weeks in April and May of 1989. We note that although the record contains copies of the writs to serve appellant with these lists, the lists purportedly attached to the writs are not included in the record.

13. The effect being that appellant would be sentenced to death.

14. The effect being that appellant would be sentenced to life.

group pending individual voir dire, at which time the following exchange occurred:

[THE STATE:] Your Honor, for the record, the State would move to strike the whole panel under [Article] 37071G [sic] [V.A.A.C.P.] wherein the Court inadvertently informed the juror [sic] to a question [sic] in favor of one juror to agree to an issue [sic] would result in life sentence. We feel that that's an accounting, poor, [sic] even in an instruction [sic] disregard [sic] in the language of the statute and spirit of fundamental fairness we would ask that the panel be struck.

THE COURT: All right.

[DEFENSE:] We would object to the panel being quashed, Your Honor.

THE COURT: All right. Okay. The Court's going to grant the State's motion to quash the panel.[15] Notes the Defense exception.

The State's motion to quash brought to the attention of the trial court the possibility that the veniremembers might have been improperly instructed. In an abundance of caution the trial court dismissed the group in an effort to remove potentially tainted jurors. Under these circumstances, prior to individual voir dire and impanelment, we hold the trial court did not abuse its discretion in dismissing the group and therefore no error is presented.

■■■■ Appellant argues that since the group of venirepersons that was quashed included one black and two Hispanic veniremembers, but the jury that served did not include such minorities, appellant was "denied the opportunity to have three minority jurors sit on this jury" and was therefore harmed. We disagree. Appellant is not entitled to a jury that includes minorities or is comprised of a proportional representation of races so long as the jury selection was not subject to discrimination. *May v. State*, 738 S.W.2d 261, 269 (Tex.Cr.App.), *cert. denied*, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 158 (1987). Moreover, parties do not have a right to the selection of any

particular juror, but only have a right to *exclude* particular jurors, *Barry v. State*, 165 Tex.Crim. 204, 305 S.W.2d 580, 587 (Tex.Cr.App.) (op. on appellant's motion for reh'g), *cert. denied*, 355 U.S. 851, 78 S.Ct. 71, 2 L.Ed.2d 56 (1957), in the absence of discrimination. We have not found merit in any of appellant's points of error complaining of various jurors and we have also concluded that appellant's *Batson* claims are without merit. Appellant also claims that the court's granting of the State's motion essentially gave the State ten additional peremptory strikes. However, the State's motion to quash these venirepersons is not analogous to the granting of additional peremptory strikes. These venirepersons had not been subject to individual voir dire by either party. There is no evidence that the State sought to gain anything by the removal of this particular group of venirepersons, other than the elimination of potentially tainted jurors, which action would not require the use of a peremptory strike. Point of error number four is overruled.

■■■■ In his fifth point of error, appellant contends that the trial court erred in excusing a qualified veniremember on its own motion, over defense counsel's objection. Specifically, appellant complains that because the veniremember had already been questioned as to her views on the death penalty and qualified by the court, the time had passed in which to excuse her from service.

The questioned veniremember established that she was the mother of three minor children, ages three, nine, and eleven, and had to be home at a certain time or would run the risk of leaving her children inadequately supervised. In *Butler v. State*, 830 S.W.2d 125 (Tex.Cr.App.1992), we stated that a trial judge may consider any excuse factor under Article 35.03 V.A.C.C.P., with or without the prompting of counsel. We further stated that the trial judge is not limited under this article to the time period before questioning takes

**15.** Although the court ruled that the "panel" was quashed, only that group of eight venire-members were excused.

place and "must retain the ability to render an excuse in order to rectify problems created by such changed circumstances as, e.g., a venireperson's sudden realization that an excuse applies to her." *Id.* This is precisely the case we have before us now. The veniremember did not apprise the trial court of her predicament until after she had been initially questioned. As soon as the court knew of her situation, it gave the parties a chance to question her, and then dismissed her from service over appellant's objection. We conclude that this action was within the trial judge's authority under Article 35.03 V.A.C.C.P. *Id.* Point of error number five is overruled.

▆▆▆ In points of error six through ten, appellant alleges the trial court erred in overruling defense counsel's challenges for cause to five different veniremembers, thus forcing appellant to take an objectionable juror after exercising all of his peremptories. In order for this Court to be able to review these points, appellant must have (1) used all of his peremptory strikes, (2) asked for and been refused additional peremptory strikes, and (3) been forced to take an objectionable juror whom appellant would not otherwise have accepted had the trial court granted his challenge for cause. *Demouchette v. State*, 731 S.W.2d 75, 83 (Tex.Cr.App.1986), *cert. denied*, 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987).

▆▆▆ At the end of the day on May 2nd, 1989, eleven jurors had been accepted to sit on the jury. Both sides had peremptory strikes remaining and neither side had requested any additional strikes. Although the series of events is not entirely clear from the record, the trial court received a call at some point in time on May 3rd that veniremember Claude Wolfe, the third veniremember accepted to serve on the twelve person jury, had been in an accident and, consequently, might not be able to sit on the jury. During the course of this same day, appellant used his last peremptory strike and the twelfth juror was accepted immediately thereafter. The proceedings then continued on into the selection of the alternate juror and the day ended with appellant exercising his one alternate peremptory.[16] The next day, during continued selection for an alternate juror, appellant requested an additional peremptory strike. When his request for an additional strike was denied, appellant had to accept the next juror as the alternate.

Appellant argues that this alternate juror is the objectionable one that he was forced to accept and although the alternate juror never actually served, appellant alleges that he suffered harm since he had to change his jury selection strategy because of the news that the third juror selected might not have been able to serve. The "strategy" that appellant claims he chose to employ was based upon the assumption that the alternate juror would have to serve in Wolfe's place.[17] Appellant says

---

**16.** Article 35.15, V.A.C.C.P., provides for the number of peremptory strikes each side in a capital case may utilize:

 (a) In capital cases both the State and defendant shall be entitled to fifteen peremptory challenges. . . . .
 (d) The State and the defendant shall each be entitled to one peremptory challenge in addition to those otherwise allowed by law if one or two alternate jurors are to be impaneled. . . . The additional peremptory challenges provided by this subsection *may be used against an alternate juror only, and the other peremptory challenges allowed by law may not be used against an alternate juror.* (emphasis added).

**17.** Appellant explained the disruption in his strategy as follows:

 While juror Wolfe was eventually able to serve and Ms. Archie, as an alternate juror, did not, defense counsel had no way of know-

ing this at the time and had to plot his jury selection strategy accordingly. By the time it was clear that Wolfe was going to be able to serve, the voir dire selection process was over and the time frame within which defense counsel had to not [sic] for the record that he had been forced to take an objectionable juror had long since passed. Had defense counsel not felt that juror Wolfe might not be capable of serving so as to underscore the critical nature of selecting an alternate juror, he might well have opted to pursue a different strategy insofar as either utilizing his final peremptory challenge or in making an earlier declaration that he had been forced to accept an objectionable juror was concerned.

Appellant further urges that "[i]n light of the fact that those events involving Wolfe's putative inability to serve were clearly beyond defense counsel's control, and given the severity of the penalty assessed in this case," fundamental fair-

that had he known the alternate would *not* have to serve, he might have either utilized his peremptory strikes differently or pointed to a different juror as objectionable. Appellant essentially seeks to avoid preservation of error requirements because he chose to act upon the assumption that veniremember Wolfe would not be able serve. We find no merit in this argument. The fact that appellant's "strategy" was not successful and as a result he failed to preserve error does not entitle appellant to bypass preservation of error requirements. A different case might be presented had appellant been informed that juror Wolfe would not be serving, and then later Wolfe served. However, both parties were informed of the uncertainty of Wolfe's service and appellant therefore assumed a calculated risk in employing a trial strategy based upon an assumption that Wolfe would *not* be serving. As a result of his "strategy" appellant failed to preserve error. Wolfe was ultimately able to serve and, thus, the alternate juror never did. Hence, appellant was not forced to accept the alternative juror, whom he claims was objectionable, as a juror. Points of error numbers six through ten are overruled.

 Appellant alleges in points of error numbers eleven through fourteen that the trial court erred in sustaining the State's challenges for cause as to particular veniremembers. In each point of error, appellant maintains that the veniremember was improperly excused pursuant to his or her views on the death penalty. The standard to be followed in determining whether a juror was properly excused is whether his or her views would have "prevented or substantially impaired the performance of his duties as [a] juror in accordance with his instructions and his oath." *Bell v. State,* 724 S.W.2d 780, 794 (Tex.Cr.App. 1986) (citing *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). This standard recognizes that particular veniremembers may be "reticent, inarticulate, or unsure of how they would react when faced with imposing the death sentence." *Id.* at 794. When the record appears ambiguous and such ambiguity cannot fairly be resolved on the face of the record, then deference should be paid to the trial judge who had the opportunity to see and hear the prospective juror. *Mooney v. State,* 817 S.W.2d 693, 701 (Tex.Cr. App.1991).

 In point of error number eleven, the record reflects that while veniremember Janice Norvick was not philosophically opposed to capital punishment, she felt that she could not personally participate in reaching a verdict that would sentence someone to death. When pressed for a commitment as to whether she could answer the punishment questions according to the law and her oath, Norvick gave the following responses:

[THE STATE]: So, could you answer the questions yes if they were proven to you?

[NORVICK]: I don't think so. I know that's not yes or no.

[THE STATE]: Believe me, everybody knows it. But, Judge [sic] can't make a decision about your qualifications unless he has a yes or no. And as much as I hate to put you in that position, I guess I fall back and say it's not my fault that's what the law says.

[NORVICK]: I say no.

Thereafter, the State passed the veniremember to appellant. In attempting to rehabilitate Norvick, appellant ultimately was able to elicit fairly direct responses to questions about the specific special issues. The following exchange is set forth in its entirety:

[DEFENSE COUNSEL]: We'll [sic], what I'm asking is could you consider— let's go to Issue Number One. Could you consider answer [sic] Question Number One yes if the State proved to you beyond a reasonable doubt that the defendant caused the death of the deceased deliberately; or in the alternative, if they did not prove to you beyond a reasonable doubt, could you consider and answer that question no?

[NORVICK]: Yes.

ness would compel a conclusion that the error was properly preserved on this issue.

[DEFENSE COUNSEL]: So, it would depend on the evidence that the State brings forth and whether or not they prove to you beyond a reasonable doubt that you would answer that question either yes or no; is that correct?

[NORVICK]: Yes.

[DEFENSE COUNSEL]: Now, would the same thing apply to Issue Number Two?

[NORVICK]: That one I don't know if I could answer or not.

[DEFENSE COUNSEL]: The question here is whether or not in your mind you're able to separate the way that you feel about the death penalty and can look at the evidence and decide on the evidence whether or not those Issues should be answered yes. Could you do that?

[NORVICK]: I still think that I would be looking at my conscience and what I believe and what I think rather than what the law says.

[DEFENSE COUNSEL]: Are you telling this Court that you would actually lie and answer one of those no so that he would not get the death penalty?

THE STATE: We object as being argumentative and improper question.

THE COURT: Rephrase that.

[DEFENSE COUNSEL]: You would not answer one of those questions no purposely so that the person would get life?

[NORVICK]: I don't think consciously realizing I was doing that I would do that, no.

At this point, appellant passed the witness and the State offered to make further inquiry if the court thought it necessary, which the court did not. The court granted the State's challenge for cause over appellant's objection and the veniremember was excused.

■ Although Norvick recanted on her original position with respect to the first special issue, the qualitative nature of her responses as to issue number two continued to support the trial court's finding that her ability to follow the law and her oath would be substantially impaired. *Vig-*

*neault v. State,* 600 S.W.2d 318, 327 (Tex. Cr.App.1980) (fact that veniremember would answer issues "truthfully to the best of her knowledge" did not demonstrate that her views against the death penalty would be subjugated). Point of error number eleven is overruled. The transcription of the voir dire examinations of the veniremembers at issue in points twelve through fourteen reflects that they were even more adamantly opposed than Norvick to answering the punishment questions in such a way as to automatically invoke the death penalty. Points of error numbers twelve through fourteen are overruled.

In points of error fifteen through seventeen, appellant alleges that the trial court erred in permitting the State, over appellant's objection, to utilize its peremptory challenges to exclude veniremembers solely on account of their race. U.S. Const. amend. VI and XIV; Tex. Const. art. I, § 10; Art. 35.261, V.A.C.C.P.. Briefs of appellant and State, alike, only discuss the treatment of two particular veniremembers, Margie Burford and James Douglas. Therefore, we will address the appellate points only as to these two veniremembers. *See* Tex.R.App.Proc. 74(d).

■ As to veniremember Douglas, upon appellant's objections to the State's use of a peremptory strike against Douglas, the State articulated race neutral reasons for its strike. Thereafter, the court overruled appellant's objection. In reviewing *Batson* [18] challenges, the trial court shall review the testimony of the challenged veniremember as a whole to determine if the State's given race-neutral reasons actually conceal a truly racial motive. *Keeton v. State,* 749 S.W.2d 861, 866–68 (Tex.Cr.App.1988). The focus of the trial court should be to determine whether the State has exercised purposeful discrimination. *Williams v. State,* 804 S.W.2d 95, 101 (Tex.Cr.App.) (citing *Keeton* ), *cert. denied* —— U.S. ——, 111 S.Ct. 2875, 115 L.Ed.2d 1038 (1991); *Tennard v. State,* 802 S.W.2d 678, 680 (Tex.Cr.App.1990) (citing *Keeton* ), *cert. denied* —— U.S. ——, 111

---

18. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

S.Ct. 2914, 115 L.Ed.2d 1077 (1991); *Keeton*. The decision of the trial court will be reversed only where the appellate court determines that the trial court's decision was "clearly erroneous". *Hill v. State*, 827 S.W.2d 860 (Tex.Cr.App.), *cert. denied*, —— U.S. ——, 113 S.Ct. 297, 121 L.Ed.2d 221 (1992); *Williams*, 804 S.W.2d at 101; *Whitsey v. State*, 796 S.W.2d 707, 726 (Tex.Cr.App.1989). The reviewing court shall consider the prospective juror's voir dire as a whole and accord due deference to the trial judge's ruling. *Crane v. State*, 786 S.W.2d 338, 344 (Tex.Cr.App. 1990).

 Here, we see nothing in the record to indicate that the trial court's conclusion that the State did not exercise purposeful discrimination was "clearly erroneous". According due deference to the trial court's ruling, we conclude that the trial court did not err. Moreover, twelve jurors had been accepted by the time veniremember Douglas was questioned and, therefore, if he had been accepted, it would have been as an alternate. Since no alternate was ever called upon to deliberate, Douglas would not have served, had he been chosen. Thus, appellant can show no harm by the excusal of veniremember Douglas. Points of error fifteen through seventeen are overruled as to veniremember Douglas.

Concerning the State's peremptory strike of Burford, on February 5, 1992, in a published opinion, this Court abated this appeal and remanded the cause to the trial court for a full, adversarial hearing in compliance with Article 35.261 V.A.C.C.P. and *Batson v. Kentucky. See Rousseau v. State*, 824 S.W.2d 579 (Tex.Cr.App.1992). On February 28, 1992, the trial court held an adversarial hearing pursuant to this Court's order, the transcript of which was thereafter forwarded to this Court for our review. We now conclude that the trial court did not err in allowing the State to exercise its peremptory strike on veniremember Burford.

At the conclusion of the hearing, "having observed the manner and demeanor of the witnesses and having considered the arguments of counsel," the trial judge made the following findings of fact which are pertinent to our decision today:

8) That both prosecutors considered the apparent conflicts within a questionnaire supplied to [the venirewoman] by the Court.

9) That both prosecutors considered Margie Foster Burford to have been vacillating in her answers to questions posed by the Court, defense and State.

\* \* \* \* \* \*

11) That Assistant District Attorney [name omitted] formed the opinion that [the venirewoman] may have been more sympathetic to the defendant than other prospective venirepersons because of her business contact with drug abusers.

12) That Assistant District Attorney [name omitted] formed the opinion that [the venirewoman] would hold the State to a higher burden of proof than required by law.

13) That Assistant District Attorney [name omitted] formed the opinion that [the venirewoman] had a bias against the State in a key issue of its case, i.e. convictions upon the testimony of a single witness.

\* \* \* \* \* \*

15) That the State did not exclude all members of the black race from the jury, there being two jurors who were black and an alternate juror who was black.

16) That the State exercised its peremptory challenge against [the venirewoman] based upon the totality of her answers given during voir dire, on her pre-voir dire questionnaire and from her demeanor during voir dire examination.

The trial court then made its conclusions of law and found that the State exercised its peremptory challenge against Burford for racially neutral reasons which were not rebutted by appellant. The trial court also found that appellant failed to otherwise demonstrate that racial bias or prejudice played any part in the selection of the jury.

 In reviewing appellant's point that the State used its peremptory challenge against Burford in a discriminatory manner, an appellate court must view the

record in the light most favorable to the trial court's ruling and may not disturb the ruling on appeal unless the ruling is clearly erroneous. *Harris v. State*, 827 S.W.2d 949, 955 (Tex.Cr.App.1992). Hence, a reviewing court must not reverse a trial court's *Batson* decision unless the reviewing court is left with a firm conviction that a mistake has been committed. *Id.*

▇▇▇ After studying the complete voir dire examination of venirewoman Burford, the entire text of the subsequent hearing, and the trial judge's findings of fact and conclusions of law, we conclude that the trial judge's findings are supported by the record and therefore we cannot conclude that those findings were clearly erroneous. Appellant's points of error fifteen through seventeen are overruled.

Appellant contends in point of error number eighteen that the trial court erred in permitting the prosecutor "to elicit from Officer Escalante during the guilt-innocence stage of the trial that the investigating detectives in this case 'were the finest detectives who work in homicide.'" The record reveals that the following transpired:

> [THE STATE]: Officer Escalante, can you tell me what kind of reputation [names of four officers omitted] enjoy in the homicide division?
>
> [THE DEFENSE]: Objection. Irrelevant.
>
> THE COURT: Overruled.
>
> [WITNESS]: They are one of the finest detectives [sic] who work up in homicide. They always do very thorough investigations, and their results are always positive, or they get good sentences on the suspect. They are one of the best [sic] up there.

Although appellant's complaint on appeal, that the testimony was bolstering, does not comport with the objection made

at trial, that the testimony was irrelevant, we will, in the interest of justice, address the merits of appellant's claim on appeal.

▇▇▇ Bolstering occurs when one party introduces evidence for the purpose of adding credence or weight to earlier unimpeached evidence offered by that same party. *Guerra v. State*, 771 S.W.2d 453, 474 (Tex.Cr.App.1988), *cert. denied*, 492 U.S. 925, 109 S.Ct. 3260, 106 L.Ed.2d 606 (1989). When the State elicited testimony concerning the quality of the officers' investigative skills, appellant had not called those skills into question by prior impeachment of the officers' testimony.[19] This testimony was therefore, as appellant contends, improper bolstering. However, improperly admitted bolstering evidence does not necessarily call for reversal, but is subject to a harmless error analysis. *See Davis v. State*, 636 S.W.2d 197 (Tex.Cr. App.1982). Subsequent to the bolstering testimony, appellant attempted to show that the police disregarded information given to them by certain eyewitnesses and did not follow up on interviews with other witnesses, calling into question the quality of the investigation.[20] In closing appellant discussed at length the quality and thoroughness of the investigation. In light of the attention given to this issue by appellant and the questions raised by appellant concerning the quality of the investigation, the testimony elicited by the State was harmless. Point of error number eighteen is overruled.

▇▇▇ In point of error number nineteen, appellant contends that the trial court erred in overruling defense counsel's motion for mistrial made after the prosecutor's allegedly improper comments during final arguments at the guilt-innocence phase of trial, on appellant's failure to produce alibi witnesses on his behalf.

---

**19.** The State claims that appellant had opened the door to the bolstering by previously questioning one of the officers about a follow up interview and about interviewing a potential witness. However, review of the record shows these questions did not amount to impeachment of the witnesses' testimony.

**20.** In particular, two witnesses claimed that appellant was not the man they saw running from the scene the night of the offense. Appellant attempted to show that the police disregarded the information given to them by these witnesses and did not pursue them as potential witnesses.

In closing argument for the guilt/innocence phase of trial, the following transpired:

[THE STATE]: [O]ne thing I would point out to you that you know that [appellant's wife] is just a block away. You know [her son] is in town. Where are the alibi witness? (sic) Why didn't they come in and say—

[DEFENSE COUNSEL]: Objection. Outside the record.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Your Honor, may this jury be instructed to disregard the last statement?"

THE COURT: Disregard the last statement.

[DEFENSE COUNSEL]: Move for mistrial.

THE COURT: Overruled.

[THE STATE]: I have established that these people are here in Houston. You didn't hear from them.

[DEFENSE COUNSEL]: Your Honor, again I object to that last statement, you know, after I made my objection, Your Honor.

THE COURT: Sustained.

[DEFENSE COUNSEL]: May the jury be instructed to disregard?

THE COURT: Disregard the last statement.

[DEFENSE COUNSEL]: Move for mistrial.

THE COURT: Overruled.

Appellant's complaint is without merit. It is within the bounds of permissible jury argument for the State to comment on an appellant's failure to call competent and material witnesses, including an appellant's wife. *Albiar v. State*, 739 S.W.2d 360 (Tex.Cr.App.1987); *King v. State*, 614 S.W.2d 165, 167 (Tex.Cr.App.1981); *Ferrell v. State*, 429 S.W.2d 901, 902 (Tex.Cr.App.

1968). Point of error number nineteen is overruled.

In point of error number twenty, appellant alleges that the trial court erred in denying defense counsel's request to admonish the jury that they were not to consider appellant's failure to testify in any manner. This request was made after the bailiff mentioned that he had overheard at least one member of the jury, during their deliberations on guilt-innocence, discussing appellant's failure to testify. In point of error number twenty-one, appellant alleges that the trial court erred in overruling his motion for mistrial presented as a result of the bailiff's report.

Shortly after the jury retired to deliberate on the guilt-innocence phase of the trial, the bailiff claimed to have overheard portions of the discussions taking place inside the jury room. The record reveals the following discussion in this regard:

BAILIFF [name omitted]: It is my belief that I heard a male member of the jury just inside the jury room door make some comment with regard to, as [the defendant's attorney] has put it, the defendant not testifying. I am not specific on the verbiage. As the court is already aware, of course, of the construction of the door; but it appeared to be there was a comment with regard to the failure of the defendant to testify.

\* \* \* \* \* \*

THE COURT: Okay. I will admonish them to keep their voices down.

[DEFENSE COUNSEL]: My request was to admonish them again [21] that they are not to consider [sic]—that part of the charge. That is, to me, very specific; but, obviously, someone in there has not followed that specific instruction.

THE COURT: Didn't I tell them that?

[THE STATE]: It's in there, judge. And counsel is, you know, we have no indica-

---

21. An instruction was included in the charge which stated:

Our law provides that a defendant may testify in his own behalf if he elects to do so. This, however, is a right accorded a defendant, and in the event he elects not to testify, that fact cannot be taken as a circumstance against him.

In this case, the defendant has elected not to testify and you are instructed that you cannot and must not refer to or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against him.

tion whether or not that it was discussed or that they were not properly—or that the jurors didn't follow the court's instruction. For all we know, they were reading the Court's Charge. And I would object to the court selecting some portion of the charge to emphasize to the jury. That would be improper.

\* \* \* \* \* \*

They have been given the charge, been given the oath to follow the law.

[DEFENSE COUNSEL]: Obviously, they are not doing that. ·

[THE STATE]: Who knows what they really heard through the door?

\* \* \* \* \* \*

[The bailiff] said he heard some verbiage. For all we know, [the juror] could have been reading the charge.

After this colloquy, appellant moved for a mistrial which the trial court overruled, but stated that it would "make an inquiry at the end whether this was discussed on it." Appellant then proceeded to argue a related motion, after which appellant again asked the trial court to declare a mistrial on the grounds of the bailiff's testimony. Appellant's motion was again overruled by the trial court. The jury returned a verdict shortly thereafter.

Until the hearing on appellant's motion for new trial, no further argument or evidence, by way of offer of proof or direct testimony, was offered concerning the alleged jury misconduct. There is also no evidence in the record that the trial court ever "[made] an inquiry" of the jurors as it had indicated it would. At the hearing on appellant's motion for new trial, the State presented into evidence the affidavit of one of the jurors[22] which stated:

In regards to the jury's deliberations at guilt/innocence: No one mentioned the Defendant's failure to testify other than

to read the instruction contained in the Court's charge.

\* \* \* \* \* \*

The jury's verdict was based on the evidence that we heard. The defendant's failure to testify was not considered as evidence in any form or fashion at either stage of the deliberations. My verdict was based solely on the evidence.

I received a questionnaire from the defense attorney, [defense attorney's name omitted], in which I answered his questions the same way.

Although appellant apparently sent at least this juror a questionnaire, appellant presented no evidence or argument in support of the alleged jury misconduct at the hearing.[23]

██ This Court has previously held that a "bare allusion to appellant's failure to testify" will not amount to jury misconduct. *Clark v. State*, 398 S.W.2d 763, 768 (Tex.Cr.App.1966), *cert. denied*, 385 U.S. 1011, 87 S.Ct. 722, 17 L.Ed.2d 549 (1967); *see also Byrom v. State*, 225 S.W.2d 842 (Tex.Cr.App.1950). Further, it is within the discretion of the trial judge to determine jury misconduct. *Norman v. State*, 588 S.W.2d 340, 347 (Tex.Cr.App.1979), *cert. denied*, 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 261 (1980). Here, the bailiff informed the trial court that he "heard a male member of the jury ... make some comment with regard to ... the defendant not testifying." In view of the speculative nature of bailiff's testimony and in light of the proper jury charge instructions addressing this issue, we conclude that the trial court did not abuse its discretion in refusing to disrupt the jury during deliberations in order to re-instruct them on an issue already included in the charge. Appellant's point of error twenty is overruled.

██ With respect to appellant's motion for mistrial, the only evidence or offer of

---

**22.** Tex.R.App.P. 31(d) specifically allows the trial court to hear evidence by affidavit or otherwise. .

**23.** Appellant's written motion for new trial contained the bare allegation that "Jurors discussed [appellant's] election not to testify during the guilt/innocence phase of the trial in determin-

ing whether to find [appellant] guilty or not guilty of CAPITAL MURDER." Although appellant also filed a memorandum in support of his written motion for new trial, his memorandum did not address the allegations of jury misconduct.

proof that appellant presented in support thereof was the bailiff's testimony that he had heard a juror make a comment about appellant's failure to testify. As the State pointed out, what the bailiff heard could well have been a juror merely reading the charge aloud. Again, in light of the speculative nature of the bailiff's testimony, we conclude the trial court did not abuse its discretion in denying appellant's motion for mistrial. Furthermore, we note that appellant had the opportunity to bring the matter before the trial court again and present additional evidence at the hearing on appellant's motion for new trial. Although the State presented a juror's affidavit demonstrating the lack of any jury misconduct, appellant did not present any new evidence in support of such claims. Point of error twenty-one is overruled.

■ In points of error twenty-two through twenty-four, appellant challenges the sufficiency of the evidence to support the jury's affirmative answer to punishment questions one, two, and three, respectively. *See* Article 37.071(b) V.A.C.C.P.. The well-established standard in reviewing these three points of error is whether, looking at the evidence in the light most favorable to the jury's verdict, any rational trier of fact could have found the elements of each separate question beyond a reasonable doubt.

■ This Court has held that the term "deliberate" need not be defined in the charge[24], although we have determined that the term means more than intentional, but less than premeditation. *E.g., Farris v. State*, 819 S.W.2d 490, 497 (Tex.Cr.App. 1990), *cert. denied*, — U.S. —, 112 S.Ct.

1278, 117 L.Ed.2d 504 (1992). Reviewing the evidence in the light most favorable to the jury's affirmative answer on the first issue, we find the evidence sufficient to support the finding that appellant acted deliberately and with a "conscious decision involving a thought process which embraces more than mere will to engage in the conduct." *Id.* (quoting *Lane v. State*, 743 S.W.2d 617 (Tex.Cr.App.1987)). The uncontroverted testimony was that from the initiation of the encounter appellant was armed with a loaded pistol, which was cocked and ready for use throughout the incident, and that when the victim did not comply with appellant's demands, appellant took careful aim and fired his gun. These facts were sufficient to find that appellant acted deliberately. *See Dunn v. State*, 819 S.W.2d 510, 514–15 (Tex.Cr.App.1991), *cert. denied*, — U.S. —, 113 S.Ct. 105, 121 L.Ed.2d 63. Point of error number twenty-two is overruled.

■ As to the issue of appellant's future dangerousness, this Court heretofore has listed several factors that may be considered in determining whether a rational trier of fact could have found beyond a reasonable doubt that appellant would probably commit criminal acts of violence that would constitute a continuing threat to society.[25] Again, this evidence must be looked at in the light most favorable to the jury's verdict.

At the punishment stage of the instant case, the State first offered all of the evidence presented during the guilt-innocence phase. Under the proper circumstances, the facts of the offense alone might be

**24.** We note, however, that the term deliberate was defined in the charge as,
[A] manner of doing an act characterized by or resulting from a conscious decision involving a thought process which embraces more than mere will to engage in the conduct.

**25.** *See Vuong v. State*, 830 S.W.2d 929 (Tex.Cr. App.1992); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex.Cr.App.1987) ("Keeton I"). These factors include, but are not limited to:
1. the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;
2. the calculated nature of the defendant's acts;
3. the forethought and deliberateness exhibited by the crime's execution;
4. the existence of a prior criminal record, and the severity of the prior crimes;
5. the defendant's age and personal circumstances at the time of the offense;
6. whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;
7. psychiatric evidence; and
8. character evidence.

sufficient to support an affirmative finding to the second special issue. *Allridge v. State,* 850 S.W.2d 471, 488 (Tex.Cr.App. 1991). Here, the commission of the offense, by itself, is not sufficient to support the jury's affirmative answer to the issue of future dangerousness. However, other evidence elicited at trial included prior federal and state convictions concerning drug-related offenses as well as a history of drug abuse. Appellant was also shown to have a prior conviction for attempted burglary of a habitation. Testimony was introduced that appellant had a reputation for being both armed and dangerous and his reputation for being a peaceable and law-abiding citizen was bad. Further evidence was submitted to the jury concerning appellant's alleged participation in at least four unadjudicated bank robberies committed shortly before the commission of the instant offense. Evidence offered in mitigation included testimony that appellant had turned himself in and that he did not make trouble in prison. We conclude that this combination of evidence is sufficient beyond a reasonable doubt to support the jury's affirmative finding to punishment question number two. Appellant's point of error number twenty-three is overruled.

■ Appellant also challenges the sufficiency of the evidence to support punishment question number three, whether appellant's conduct was unreasonable in response to provocation by the deceased. The evidence adduced at trial revealed that the victim started reaching for his own gun; he had some trouble removing the weapon from its holster (which was located at his ankle). Sullivan testified that appellant, upon seeing the victim reach for something, immediately approached the victim, raised his already cocked weapon and said, "[s]top, or I will shoot." The testimony was conflicting as to which party took the first shot. Sullivan testified that just as the victim succeeded in removing the gun from its holster, appellant commenced firing. Another witness testified, however, that the victim fired the first shot. Sullivan further testified that the victim began moving toward a tree for cover, and that appellant tracked the victim with his weap-

on and continued shooting until the victim yelled out that he had been shot and fell to the ground. Appellant then fled the scene.

Use of deadly force by a victim does not necessarily entitle a defendant to a negative finding on the third special issue:

> ... a defendant is not entitled to a "no" answer on the third punishment issue simply because there is evidence in the record that the victim used deadly force in resisting the defendant. While such evidence may be "mitigating" and entitle a defendant to submission of the third issue at punishment, (citations omitted) it does not render the evidence insufficient to support an affirmative finding on the third punishment issue.

*Harris v. State,* 784 S.W.2d 5, 11 (Tex.Cr. App.1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 966 (1990); *see also Smith v. State,* 676 S.W.2d 379, 393 (Tex. Cr.App.1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2173, 85 L.Ed.2d 490 (1985) (evidence that victim shot and wounded defendant did not require a "no" answer on third special issue). Moreover, a victim has a right to defend himself and others, and such actions do not necessarily amount to provocation. *Id.*

The victim was justified in trying to recover his property and attempting to protect himself and his colleague. This cannot be considered provocation, much less sufficient provocation, for appellant's actions. Appellant points to no other evidence on the issue of provocation. We hold the evidence is sufficient to support the jury's affirmative finding on the third punishment issue. *Harris,* 784 S.W.2d at 11; *Smith,* 676 S.W.2d at 393. Point of error number twenty-four is overruled.

Appellant complains in point of error number twenty-five that the trial court erred in refusing to admit, at the guilt-innocence stage of trial, the testimony of a psychologist concerning the reliability, or lack thereof, of eyewitness identification. He contends that this testimony was admissible as expert testimony under Texas Rule of Criminal Evidence 702, because it was

relevant under Texas Rule of Criminal Evidence 402.

The threshold determination for admitting expert testimony is whether the "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue...." TEX. R.CRIM.EVID. 702. As this Court stated in *Pierce v. State*, 777 S.W.2d 399, 414 (Tex.Cr.App.1989), *cert. denied*, 496 U.S. 912, 110 S.Ct. 2603, 110 L.Ed.2d 283 (1990), we agree with the characterization of Federal Rule of Evidence 702, which is identical to our own:

> Whether the situation is a proper one of the use of expert testimony is to be determined on the basis of assisting the trier. "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." [citation omitted.] When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time. [citation omitted.]

*Id.* (quoting official commentary to Federal Rule 702). In *Pierce*, the expert who was to testify on the inherent unreliability of eyewitness testimony stated that he had not examined any of the witnesses in the case and "could not say which of the factors he discussed would be applicable and, if applicable, to what extent they would undermine the witnesses' testimony." *Id.* at 414. We held that the failure of the witness to "fit" his testimony to the evidence in that case reduced the likelihood that the jury would be aided by the expert's testimony.

In the instant case, the record reveals that appellant called Dr. Curtis Wills to the stand and the State first examined him outside the presence of the jury. After establishing his credentials, Dr. Wills testified to the following:

[BY THE STATE:]

Q. Well, why are you here to testify? What are you going to testify about?
A. I am going to testify about the accuracy of eyewitness identification in memory.
Q. What are you going to say?
A. That it's flawed.
Q. Is that it?
A. Bottom line, yes.
Q. Eyewitness identification is flawed?
A. Eyewitness identification, the stages of eyewitness identification memory, the retrieval of that information, and the communication from an individual who made the original eyewitness, that process is flawed with many, many errors.
Q. In all cases?
A. The research would indicate that the probability for error is significant. I cannot say in all cases that an individual is wrong or right. I am not here to testify about whether one individual is wrong or right. I am talking about studies.

Appellant did not ask Dr. Wills any questions during this initial examination.

It appears from Dr. Wills' testimony that he had not examined any of the eyewitnesses in the instant case, either for the State or the defense. Furthermore, Dr. Wills did not say whether any of the factors which he would discuss would apply to any of the eyewitnesses nor "if applicable, to what extent they would undermine the witnesses' testimony". Appellant's failure to "fit" Wills' testimony to the evidence in this case greatly reduced the likelihood that the jury would be measurably aided by this testimony. *See Pierce*, 777 S.W.2d at 415–16. We conclude that the trial judge did not abuse his discretion in excluding Dr. Wills' testimony. *Id.* at 416; TEX.R.CRIM.EVID. 702. Point of error number twenty-five is overruled.

Appellant's points of error numbers twenty-six, twenty-seven, and twenty-eight are constitutional challenges to Article 37.071(g) V.A.C.C.P., as it relates to the eighth amendment to the United States Constitution, Article 1.09, V.A.C.C.P., and Article I, section 13, of the Texas Constitution, respectively.

Appellant claims that subsection (g) of article 37.071 misleads the jury by creating the impression that the jury must be unanimous in answering "no" to the special issues in order to give effect to the mitigating evidence. Appellant argues that this scheme results in cruel and unusual punishment because it creates "far too high a risk that the jurors ... were simply left in the dark about their *individual* ability to give effect to their *individual* determination that death was not appropriate punishment in this case." [26]

In 1976, the United States Supreme Court upheld the Texas capital punishment scheme and article 37.071 V.A.C.C.P. as constitutional and not amounting to cruel and unusual punishment. *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). We have held that subsection (g) of article 37.071 does not amount to a due process violation. *Sterling v. State,* 830 S.W.2d 114, 121–22 (Tex.Cr.App.1992), *petition for cert. filed; Davis v. State,* 782 S.W.2d 211, 221 (Tex.Cr.App.1989), *cert. denied,* 495 U.S. 940, 110 S.Ct. 2193, 109 L.Ed.2d 520 (1990). While appellant argues that we are relieving the jurors of their responsibility by not allowing them to know the effect of their answers, we are convinced of the opposite. To inform the jury of the effect of its answers would encroach upon the jury's factfinding function and would be an "open invitation for the jury to avoid its responsibility and to disagree." *Davis,* 782 S.W.2d at 221. This

in no way subjects appellant to cruel and unusual punishment under either the federal or state constitutions or under article 1.09 V.A.C.C.P. Points of error twenty-six through twenty-eight are overruled.

Appellant complains in his point of error number twenty-nine that the trial court erred in denying his request to define certain terms contained in Special Issue No. 2 of the punishment charge.[27] In his related point of error thirty-one, appellant asserts that the trial court erred in refusing his requested jury instruction defining the term "deliberately" as it is used in Special Issue No. 1 of the punishment charge. This Court has consistently rejected claims that the terms "deliberately", "probability", and other common terms need be specifically defined and we decline to reconsider our settled precedents in the present case. *See Lewis v. State,* 815 S.W.2d 560 (Tex.Cr.App.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1296, 117 L.Ed.2d 519 (1992) (and cases cited therein); *see also King v. State,* 553 S.W.2d 105 (Tex.Cr.App.1977), *cert. denied,* 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 793 (1978). Points of error twenty-nine and thirty-one are overruled.

Appellant contends in point of error thirty that the trial court erred in overruling his motion to quash the indictment on the grounds that the State systematically excluded Hispanics as grand jury forepersons. The record reveals that appellant filed a pre-trial motion to this effect, an evidentiary hearing was held by the trial

**26.** Appellant points to the Supreme Court's decision in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), as controlling. However, under the Maryland sentencing scheme at issue in *Mills,* jurors were given the impression that if they did not unanimously agree on the existence of the same mitigating evidence, no single juror could give such evidence any effect and they were compelled to impose a death sentence. Under the Texas scheme, a single juror can give effect to any mitigating evidence by voting "no" on any special issue, resulting in the imposition of a life sentence. That was made clear in the jury charge in the instant case which stated, in part, that "if any juror, after considering the evidence and these instructions, has a reasonable doubt as to whether the answer to a Special Issue should be answered 'Yes,' then such juror should vote 'No' to that Special Issue."

We note that article 37.071 was amended subsequent to the trial of this case to expressly provide that jurors need not agree on what particular evidence supports a negative or affirmative answer to the special issues. Article 37.071(2)(d)(3), (2)(f)(3) V.A.C.C.P. (amendments effective September 1, 1991). Although the interpretive commentary to article 37.071 states that these revisions "foreclose the potential for challenges" based upon *Mills,* the article prior to the revisions did not violate *Mills. See Draughon v. State,* 831 S.W.2d 331, 338 (Tex.Cr. App.1992), *cert. filed.*

**27.** Specifically, appellant complains that the following terms were not defined: "probability," "criminal acts of violence," "continuing threat," and "society."

court, and the motion was thereafter denied.

While it is indisputable that a criminal defendant is denied equal protection of the law when he is indicted by a grand jury from which members of his racial group have been purposefully excluded, *Castaneda v. Partida*, 430 U.S. 482, 492–93 97 S.Ct. 1272, 1279, 51 L.Ed.2d 498 (1977), that is not appellant's claim. Rather, appellant claims that Hispanics have been systematically excluded as *grand jury foremen*. We hold that appellant's claim is without merit. So long as there has been no purposeful exclusion from the grand jury as a whole, the race of the grand jury foreman *is of no consequence*. The foreman's duties are ministerial in nature and do not affect the outcome of the grand jury's verdict. Point of error number thirty is overruled.

Finding no reversible error, we affirm the judgment of the trial court.

CLINTON, J., concurs in the result.

MILLER, J., concurs as to point of error four and otherwise joins the opinion of the court.

OVERSTREET, J., concurs as to points of error four and eleven and otherwise joins the opinion of the court.

BAIRD, Judge, dissenting.

For the following reasons I dissent to the disposition of appellant's fourth point of error.[1]

## I.

During his introductory remarks to the complained of panel, the trial judge stated:

Now, then, Issue 1 and 2, as well as Issue 3, if it is submitted to you, if you answer all of those Special Issues yes then the law mandates the Judge to assess the punishment at death for the

Defendant. If, however, you answer either one of those questions no, then the law mandates the Judge to assess the Defendant's punishment at life imprisonment. So, that is the way we arrive at the punishment. So, you do not assess it but that's the way its arrived at. Does everyone understand that?

At the conclusion of this statement there was a conference at the bench, after which, the trial judge stated:

The lawyers are telling me you're not supposed to know. I appreciate that. But, the verdict must be unanimous and they all must be in the affirmative.

At the conclusion of the trial judge's introductory remarks, the panel was excused from the courtroom, and the following exchange occurred:

THE STATE: Your Honor, for the record, the State would move to strike *the whole panel* under [Tex.Code Crim. Proc.Ann. art.] 37071G wherein the Court inadvertently informed the juror [sic] to a question [sic] in favor of one juror to agree to an issue [sic] would result in a life sentence. We feel that that's an accounting, poor, [sic] even in an instruction [sic] disregard [sic] in the language of the statute and in spirit of fundamental fairness we would ask the panel be struck.[2]

THE COURT: All right.

APPELLANT: We would object to the panel being quashed, Your Honor.

THE COURT: All right. Okay. The court's going to *grant the State's motion to quash the panel.*

## II.

Appellant contends the trial judge erred in excusing the panel in the mistaken belief that he had violated art. 37.071(g). At the time of appellant's trial, art. 37.071(g) provided:

IN ARTICLE 37.071(G), V.A.C.C.P., DURING ITS INTRODUCTORY REMARKS TO THE PANEL.

---

1. Appellant's fourth point of error states:
 THE TRIAL COURT ERRED IN GRANTING, OVER DEFENSE COUNSEL'S OBJECTION, THE STATE'S MOTION TO QUASH THE JURY PANEL AFTER THE TRIAL COURT MISTAKENLY BELIEVED IT HAD VIOLATED THE PROHIBITION SET FORTH

2. Unless otherwise indicated, all emphasis herein is supplied by the author.

The court, the attorney for the state, or the attorney for the defendant may not inform a juror or a prospective juror of the effect of failure of the jury to agree on an issue submitted under this article.

The trial judge did not violate art. 37.-071(g). The trial judge did not inform the panel of the effect of the failure to agree on the punishment issues, only that the punishment depended on how the issues were answered.

In order to place its judicial stamp of approval on the trial judge's excusal of ten veniremembers from a jury list promulgated in accordance with the restrictions and protections provided by the Legislature, *see, infra*, the majority holds:

> ... Under these circumstances, prior to individual voir dire and impanelment, we hold the trial court did not abuse its discretion in dismissing the group and therefore no error is presented.

*Rousseau*, 855 S.W.2d at 676.

The majority does not cite any statutory or decisional authority in support of this holding. Indeed, there is none.

### III.

Such a broad grant of discretionary authority improperly permits the trial judge to override our legislative provisions concerning the selection of a jury. The Legislature has prescribed strict procedures for the selection of juries in our State. Potential jurors are summoned from either the registered voters of the county or persons, living in the county, who hold a valid drivers license or personal identification card issued by the Department of Public Safety. Tex.Gov't Code Ann. § 62.001. From these sources, jury lists are either manually, mechanically or electronically drawn. Tex. Gov't Code Ann. § 62.004 *and* § 62.011. If manually drawn, a party may be present and observe the drawing of the jury list for the time period in which the party's case is set for trial. Tex.Gov't Code Ann. § 62.-005. The trial judge informs the clerk of the date prospective jurors are to be summoned to appear. The clerk takes the jury list, in the consecutive manner in which it was prepared, makes a notation on the list concerning the date such prospective jurors are to appear, and delivers the list to the county sheriff. Tex.Gov't Code Ann. § 62.-012. The sheriff summons each prospective juror to appear at the time and place ordered by the trial judge. Tex.Gov't Code Ann. § 62.013. A prospective juror who fails to appear is subject to contempt. Tex. Gov't Code Ann. § 62.0141 *and,* Tex.Code Crim.Proc.Ann. art. 35.01.[3]

A jury panel, or venire, is selected from the prospective jurors who appear for service. Tex.Gov't Code Ann. § 62.015. *See also,* Tex.Code Crim.Proc.Ann. art. 35.11.[4] Members of the venire are disqualified unless they meet the qualifications of Tex. Gov't Code Ann. § 62.102, § 62.105; *and* Tex.Code Crim.Proc.Ann. arts. 35.03, 35.04, 35.05, and 35.12.

In a capital proceeding, such as the instant case, the legislature has provided for the summoning of a "special venire." Tex. Code Crim.Proc.Ann. art. 34.01. A copy of the names of veniremembers summoned must be served upon the defendant two

---

**3.** Tex.Code Crim.Proc.Ann. art. 35.01 provides:
When a case is called for trial and the parties have announced ready for trial, the names of those summoned as jurors in the case shall be called. Those not present may be fined not exceeding fifty dollars. An attachment may issue on request of either party for any absent summoned juror, to have him brought forthwith before the court. A person who is summoned but not present, may upon an appearance, before the jury is qualified, be tried as to his qualifications and impaneled as a juror unless challenged, but no cause shall be unreasonably delayed on account of his absence.

**4.** Tex.Code Crim.Proc.Ann. art. 35.11 provides:

The trial judge, on the demand of the defendant or his attorney, or of the State's counsel, shall cause a sufficient number of jurors from which a jury may be selected to try the case to be *randomly selected* from the members of the general panel drawn or assigned as jurors in the case. The clerk shall *randomly select* the jurors by a computer or other process of *random selection* and shall write or print the names, in the order selected, on the jury list from which the jury is to be selected to try the case. The clerk shall deliver a copy of the list to the State's counsel and to the defendant or his attorney.

days prior to trial. Tex.Code Crim.Proc. Ann. art. 34.04. When the venire has been assembled, voir dire may be commenced. Tex.Code Crim.Proc.Ann. art. 35.17. A veniremember may be challenged for cause if the veniremember fails to meet the qualifications discussed *supra*, or for reasons specified in Tex.Code Crim.Proc.Ann. arts. 35.16, and 35.21.

Either party may peremptorily challenge a veniremember for any reason.[5] Tex.Code Crim.Proc.Ann. art. 35.14. In a capital case, each party holds fifteen peremptory challenges. Tex.Code Crim.Proc.Ann. art. 35.15. During voir dire, a veniremember is passed first to the State for acceptance or challenge and then to the defendant. Tex. Code Crim.Proc.Ann. art. 35.13. The first twelve veniremembers not challenged, either for cause or peremptorily, constitute the jury. Tex.Code Crim.Proc.Ann. art. 35.26. If the jury answers the punishment issues submitted pursuant to Tex.Code Crim.Proc.Ann. art. 37.071(b) in the affirmative, the trial judge must sentence the defendant to death. There is no legislative authority to support the majority's holding.

## IV.

Just as it ignores our legislative provisions, the majority finds itself no longer burdened with our decisional authority. The majority cites no precedent for their holding and makes no attempt to support their holding by discussion of analogous case law. The importance of preserving the jury list has long been recognized. In 1881, the Court of Appeals held:

We are informed by bill of exceptions that eight jurors were accepted and sworn to try the case, and that one ... being informed that there was sickness in his family, the court, upon its own motion, and without first having the consent of the defendant or his counsel (the defendant however not objecting), discharged [the veniremember] from serving as a juror in the case.

\* \* \* \* \* \*

That the defendant had not exhausted his peremptory challenges cannot in the least degree affect the question. *He had a right to that juror*—a right given to him by the law of the land. He may have had fifty peremptory challenges remaining, but we are at a loss to understand in what manner he could have exercised these challenges so as to restore to the eight the excused juror. Challenges are for the purpose of ridding the jury of obnoxious jurors, *but can never replace one who has been wrongfully or rightfully excused*. Though a juror may be without bias or opinion in the case, indeed honest and perfectly competent in every respect, he may possess qualities which would render him very acceptable to the State or defendant. This fact is looked to with great care in the formation of the jury in almost every case. *Again, if the judge can, without necessity, excuse from the list of veniremen a juror, though not accepted and sworn, the law requiring a special venire and service of copy of the same would be to a great extent thwarted.*

*Hill v. State*, 10 Tex.App. 618, 622–623 (Tex.App.1881). *See also, Ellison v. State*, 12 Tex.App. 557 (1882); *and, Sterling v. State*, 15 Tex.App. 249 (1883).

We have reviewed related issues. In *Houston v. State*, 162 Tex.Crim. 551, 287 S.W.2d 643 (Tex.Cr.App.1956), we held a defendant may waive error under *Hill* by affirmatively consenting to the excusal of a juror.[6] The Court held:

backward in his chair and sustained certain injuries. This fact was made known to the court, who, after securing the approval of the appellant personally and his counsel, sent a doctor, accompanied by an officer, to the jury room. The doctor reported to the court that [the juror] required immediate hospitalization and would be unable to sit on the trial. At this juncture, the court explained to appellant personally and to his counsel that [the juror] might

---

5. A peremptory challenge may not be exercised for the purpose of excluding persons from the jury on the basis of their race. Tex.Code Crim. Proc.Ann. art. 35.261.

6. In *Houston* the following occurred:
... After several of the venire had been selected, sworn and sent to the jury room, the juror ... was selected and joined the others. While waiting for the jury to be completed, [the juror] fell

In the case at bar, it is shown that the careful trial court gave the accused his option at every stage in the process of jury selection, and the appellant, we have concluded, should not now be allowed to complain that he exercised such option unwisely.

*Houston,* 287 S.W.2d at 646.

In *Draughon v. State,* 831 S.W.2d 331 (Tex.Cr.App.1992), the defendant complained "the trial judge erroneously allowed a State's challenge for cause against a veniremember who had already been accepted for jury service, sworn and empanelled (sic)." *Draughon,* 831 S.W.2d at 334. However, we held the trial judge may reconsider the qualifications of a veniremember at any time. The Court stated:

> ... At least where, as here, the entire jury has not yet been selected and no evidence received in trial of the cause, the judge is permitted general discretion to allow further examination and to entertain additional challenges when it comes to his attention that a previously selected juror may be objectionable for cause, excusable, or otherwise disqualified from jury service.

*Draughon,* 831 S.W.2d at 335.[7]

Although we have modified our holding in *Hill,* we have consistently required proof of the defendant's *consent* or of some *juror disqualification* before excusing a veniremember. *See, Houston and Draughon, supra.* By its actions today, the majority brings to reality the fear recognized by the Court in *Hill* and permits the trial judge to "thwart" our laws concerning the formation of a jury. *Hill,* 10 Tex.App. at 623. Under the majority opinion, there no longer is a need to summon veniremembers in the order in which they were drawn to be tried as to their qualifications. Tex.Code Crim.Proc.Ann. art. 35.20. No need to deliver consecutive lists of jurors to the sheriff. Tex.Gov't Code Ann. § 62.012. There may not even be a need to summon all the jurors on the list. Tex.Gov't Code Ann. § 62.013. Failure to comply with our jury selection statutes is now subject to the discretion of the trial judge. *Rousseau,* 855 S.W.2d at 676. Certainly, our opinions in *Hill, Houston, and, Draughon, supra,* are worthy of discussion by the majority. These holdings have not been overruled.

## V.

My research reveals no instance wherein the trial judge has been given carte blanche authority to dismiss a veniremember for *no reason.* In the instant case the trial judge dismissed ten veniremembers with no legal basis. Although the State argued a violation of art. 37.071(g), the record clearly demonstrates there was no such violation. Based upon my research, I would find the trial judge erred in excusing the veniremembers without a legal basis.

With these comments, I respectfully dissent.

---

be excused from the panel if all agreed, and if they did not agree the veniremen who had been selected would be discharged and the trial would be held at a later date. After consultation with his attorneys, the appellant agreed to discharge [the juror] and continue with the selection of the panel. After the panel was completed without the appellant having exercised all of his challenges, the court again called the appellant and his counsel to the bench and offered to discharge the completed panel and start all over again if the jurors then in the box were not satisfactory to all concerned. The appellant again stated that the jury which they had just completed selecting was satisfactory to him.
*Houston,* 287 S.W.2d at 645.

7. In a footnote, the Court held *Hill* did not control situations such as those in *Houston* and *Draughon* wherein the defendant either expressly consented to the discharge of the juror or the juror was disqualified under our statutes. *Draughon,* 831 S.W.2d at 335, n. 4.